Good afternoon, Your Honor. Stan Thistle on behalf of the appellant. I'd like to reserve two minutes for rebuttal. Your Honor, in this case, Judge O'Neill initially, as you're aware, held that there would be a cause of action on behalf of a child conceived through artificial insemination against the sperm bank that provided sperm with a genetic defect, and then upon reconsideration reversed himself and concluded there would not be because he felt that under New York law that one would have to get into a weighing of what the value of no life would be versus value of a life of a child with a defect. It's our position that that's not the case. We sued in products liability, breach of warranty, and breach of contract for a child who was born with Fragile X syndrome. Well, how would you measure as to the child's cause of action? How would you measure the damages if you don't do exactly what Becker suggests we cannot do as a court? Well, Becker arises in the context, Your Honor, of a physician providing medical services to a pregnant woman who fails to detect the fact that the child has a problem, be it a Down syndrome problem or genetic problem. There are two consolidated cases there, and the analysis is the same as to both, and I don't know how we can maybe help me see something I'm missing here. I don't know how we can, consistent with the decision in the case, assess any kind of damages in law here as to the child's claim, given what seems to me the incredibly wise counsel of Becker on the limitations of legal questions. Yes, Your Honor, and Becker gets down to a question of if the proper thing had been done, the child's life would have been terminated. And the court, because of that, feels that there's no way to determine But isn't that really what you're saying here, that if you knew that he, the donor, was a fragile ex-carrier, different sperm would have been selected, so Brittany would not have been born? No, sir. No, Your Honor. Excuse me. We're not saying that. We're not saying it's a but-for. It's not a negligence concept. We're saying that this sperm bank said that it would provide sperm that was free, in case of genetic defects. They did not. Therefore, they are responsible for the damages caused by that. Nobody is saying that Brittany should not have been born. That's where we differ. But Brittany would be a different person if somebody else supplied the sperm, because the fetus is a product of the egg and the sperm, and half of it is different. I agree, Your Honor, but we're not saying a different child should have been born. We are simply saying this child was born. This child was born with fragile ex-syndrome. According to the agreement with you, that was not to be the case. Stay on that question. What would you have done had you known that the sperm was a fragile ex-carrier, that the father, the biological father, was a fragile ex-carrier? I would assume that the whole thrust of this is that another donor would have been selected, and if that's true, it seems to me it's got to be true, then what you're saying is that you should have been in a position back then to have elected to have a different child. That would be the case if we were talking about a negligence action. We're not. I don't understand the difference in the concept of this case. Clearly, there's a world of difference between product liability and breach of warranty and negligence. But in this context, and brushing aside the legal theory and the very erudite kind of stuff that a law review author might want to squeeze out of this, and just getting to what's really at issue here, I don't understand the distinction. Your Honor, nobody is saying, unlike the Becker case, which was a doctor who didn't advise the plaintiff that she was carrying a child, I forget, with Down syndrome, and therefore she would have aborted, this is not that case. This is somebody whose act is not the failure to tell somebody so they can abort. This is somebody who actually causes the genetic problem. Nobody is saying that we would have gone back and aborted under this legal theory. It's simply that you provided defective sperm, which caused this problem. Ergo, you should be responsible. Counselor, did anybody cite to the court the case of Johnson v. Superior Court from California? I don't believe, our law clerk brought the matter to my attention, Mr. DeSink, and he pointed out that the case, and it was at 101 California Pellet Fourth, 869. It's a California Court of Appeals. It's on California law. And he's pretty diligent because he dug it up. And the case is indistinguishable from this case, although it's based on California law. And as far as I could see, nobody cited it. Was it cited? I don't believe we did, Your Honor. Pardon me? I don't believe we did, Your Honor. I have to tell you, under the case, you lose. Under the Johnson case. Now, it's California law, but there's a lot of reasoning in it. I read the case, and I realized, well, this isn't California law. It's New York law. But, you know, you do it wrong. Nobody cited it. I don't believe so, Your Honor. But this is, as you point out, New York law. And it's our position, again, that this is not a case where somebody is saying, you didn't tell me that I was carrying a child with this problem. If I had known, I would have aborted the child. You know, you're focusing too broadly on Becker, too narrowly on Becker. Becker with two cases. One was the amniocentesis that the woman wasn't made aware of. The other one was the woman basically asking, after having one child who died very, very early, I guess a few weeks or months old, what is the likelihood of this happening again? And she was told, it's not a hereditary disease, and it happens again. That second scenario, that part of Becker, does seem very, very close and analogous to this case. And the Court is very clear that the analysis is exactly the same, be it the amnio or the failure to properly advise in terms of risks of future pregnancies. If they get into the limitations of a legal question. And the more I thought about it, in terms of the way you're talking about product, product liability, and I'll get to the New York State statute on blood in a second, why that shouldn't apply. But you know, in terms of what sperm really is, this sperm, how can we say as a Court that it was defective? I mean, it functioned exactly the way it was designed by nature, however you define nature, be it some conglomeration of hydrogen molecules, however you want to look at that, it functioned exactly the way it was supposed to. It produced a fertile egg, and the fertile egg it produced had attributes that consisted in part of the sperm that contributed some genetic material to the egg. Now, we say in retrospect, with a value judgment that it was defective, but that's the way nature works. It wasn't effective at all, really. If you're going to look at sperm as a product, one, help me understand how you get around that, and two, maybe that's exactly why New York State has a statute dealing with blood, saying blood is not a commodity, you can't do it in terms of product liability law as a product. Now, what makes us think, and what makes us so maybe arrogant, that we as a Court can say, this sperm that functioned exactly the way nature intended it to with all of the genetically determined material that it had to transmit was defective? Your Honor, that would be, in essence, up to the jury after testimony by an expert, so I think we're getting ahead to that issue right now. Well, it may just be as a matter of lies, and that's what Becker was saying. It can't be done. It's not a kind of a determination that a Court can make. For one thing, Your Honor, this company is in the business of providing sperm. It's done so thousands and thousands and thousands of times. When they do it, they provide a brochure to the potential customer. This isn't simply somebody who inseminates someone. In that brochure, they tell the people what they do in order to make sure you're getting good sperm. Well, that would go to your warranty claim. I'm not sure it helps you with the product liability issue, but it does help you with a warranty claim. But one of the things they say in there is they talk about sperm that is absent good genetic history for three years, no birth defects. They also say it is also possible the resulting child or children could be born abnormal, have undesirable traits or hereditary tendencies, or possess any of the other problems or disabilities of children conceived by sexual intercourse. They do, Your Honor, but they also make reference to the genetic history, that there's a three-generation good genetic history, that they do their best to weed out genetic problems. And it's our position that a sperm that has a genetic defect is defective sperm. Well, that's my point. I mean, again, the warranty issue, I think your answer is very, it's helpful. Because a warranty, clearly, you could argue anyhow, arose from that. But when you say it's defective sperm, that gets us into the Becker problem, because that sperm performed exactly the way nature designed it to perform, exactly the way nature performed. It's just that we don't like the result. But that doesn't mean that the sperm was not exactly what it was supposed to be. And that is a sperm with all the possible risks that that could entail and all the frailties and possible defects it could entail. How about the statute of limitations question? Your client saw that this could be an issue and could be attributable to the sperm. So they give her some letters from doctors that say that it isn't. And you want it told by reason of those letters or what? Yes. Judge, she knew fairly soon after birth that her daughter was a fragile ex-carrier. And she would have also had a reason to believe that the sperm donor was the cause of death. Correct. And she went to an attorney. And she drafted a complaint that had so much stuff in it. Yes. And if I could get to that, fragile ex-carrier is noted by the expert reports that the defendant provided that came through to her. If you're a carrier with only so many of the genes affected, that means you might be a carrier and your children might have a problem, but you won't. And the letters said that none of the problems that she's exhibiting are the results of fragile ex-syndrome. That was provided to her attorney and to her. And that was done in 1998. At that point in time, there is no doctor that was telling her that, look, these problems that your child has, and at that point the child's only two and a half years old, are due to the fragile ex-syndrome. So what were they concealing? I mean, what were those two expert reports submitted to her concealing? They were telling her that her problems... That was the knowledge at the time. They told her that she had an increased risk her children will be at of developing the full fragile ex-syndrome. They told her there would be an increased risk of retardation in those children. I mean, that's an injury that they told, of which Dr. Gilbert specifically said was potentially there. Yeah, but that would not be a cognizable cause of action under New York law, some future risk to future generations. All right, but I'm saying you argue fraudulent concealment. Yes. From those two doctor's reports, and I'm trying to understand, given the knowledge at the the problem that the child had with mental retardation was not caused by the fragile ex-syndrome. That's their opinion. I mean, that's their opinion. If you ask the defendant all the time, are you liable here, you'll always get an answer, no, I'm not. I mean, that's what you would expect. But even SmithKline reports, her reports, her lab's reports, don't say that. The lab reports simply say that she has fragile ex-syndrome. That's right, and the only potential injury would be to the children. Correct. That's it. That's her own reports. Yes, at that time. Which say exactly what Dr. Gilbert said. So I'm still trying to understand. Well, I beg to differ. I believe the reports from the lab simply tell her what she has. It doesn't go on to say that your mental retardation is or is not caused by it. She says they say in hers that she has no clinical manifestations, and it's likely that the father does, and they tested the father, and they talked about the daughters of transmitting males are fragile ex-carriers, and their children are at increased risk to inherit a full mutation. That's all they said. That's all her own doctor said, which is consistent totally with what Dr. Gilbert said. And Dr. Gilbert further says that the mental retardation that your child has is not the result of this problem. You know, the interesting thing, in the draft complaint, you don't even allege, didn't even allege mental retardation. There were some developmental difficulties alleged, and she's shy and things of that nature. But all of a sudden, everyone's talking about retardation, and I don't even see that in the draft complaint. Yes, I didn't draft the complaint, Your Honor. It was drafted by another law firm, and at that point, apparently because of the letters sent by the IDENT, they decided not to pursue it. And the client at that point has letters telling her she doesn't have the problem, that her child does not have problems caused by this, and it's not until 2006 when she goes out to California and meets with a renowned physician there, who later publishes an article where he says, yes, she does have these problems that are caused by the brachylaxis. That's when she knew for certain. Correct. But that's not a requirement, is it? Well, Your Honor, prior to that time, she couldn't have filed a suit. How could she file a suit if she doesn't have any opinion that somebody's saying that your problems and this child are caused by this sperm? But in general, though, when you're talking about tolling, you just have to have—tolling is defeated if you know there was an injury and you can attribute it, at least, you know, there's a chance that you can attribute it to the defendant. And the fact that years later, materials come up that allow you to do that wouldn't mean that all the statutes of limitation defenses were wiped out, would it? No, but if it's an injury that you can't discover until a later point— She knew she had an injury because she knew she had—she was a fragile ex-carrier. And she knew who and what caused that. And she knew she had the—and she had the ability to investigate the claim. That's all you need for purposes of the statute to run. Your Honor, in this case, I would disagree because she's already been told by the defendants that you do not have a problem as a result of this. But the defendants— And this is an obligation of due diligence. And you're assuming that the defendants said anything that misled her. And I think after reading these two reports in which you rely, I find it very difficult to believe that they did. All right. Well, the case law I cite in Pennsylvania, Your Honor, where a physician will tell a patient— The plaintiff's physician. Correct. The plaintiff's own physician, not the adversary's physician. Those cases, every one of them had to deal with a plaintiff's own lawyer saying— A plaintiff's own doctor. Plaintiff's—excuse me—own doctor saying. And I, at least speaking only for myself, I see that as a difference. Well, there has to be—there's an issue of reasonableness in terms of whether or not— I think you have to keep in context that these reports were sent right around close to the time where potentially a statute might run if you're using a two-year period. By the time she found out where the problem was, if these reports had been sent in litigation, there's no problem. If they had been sent down the road, there's no problem. But here they were sent in order, I believe, to convince this woman that she did not have a cause of action and simply go away. And by the time she finds out through valid investigation that she has a cause of action, time passes. But now the defendant says, look, the statute of limitations is gone. Her diligence was affected by these reports. In any event, that would only eliminate her cause of action. It would not eliminate Brittany's cause of action. Is that right?  And Brittany's cause of action, again, Your Honor, comes back to this is not a defendant who fails to tell somebody something and therefore they don't abort a fetus. This is somebody who had a relationship with the defendant, a contractual agreement that we allege they had with it, whose failure to live up to that contract caused the child to be born with genetic problems. Was the contract with, well, Judge O'Neill specifically did not decide whether it was with a doctor. No, the contract was whether it was Ida and the doctor or whether it was Ida and Donna. Yes, that issue hasn't been decided. I'm just going on the allegations in the brief since this is. If there was a contract at all. Yeah. Which is a whole other question. Yeah. I don't have any other questions. No. Thank you. Thank you. May it please the Court. My name is Rory Lubin of the Wilson-Elser firm and I stand before you very privileged to argue on behalf of Ida and Laboratories. Based on some of the questions that I heard during the appellant's presentation, I'm going to try to be brief and to the point. You know, sometimes lawyers get a sense, and we haven't discussed this case to the point of conclusion, but sometimes lawyers will stand up and they say, we rest on our briefs. And then sometimes they'll feel compelled, well, I got 15 minutes of time here and I'm going to, I don't get in here an awful lot. So I'm going to make sure I speak for at least 15 minutes. And my sense is the way these three guys are going, I'm going to prefer more than 15 minutes. And so I'm going to make hay while the sun shines, but I just tossed that out. Thank you, Your Honor. Let me start by reiterating the rule of law. Well, let me add another one to that. I've, on occasion, when I was arguing cases in the appellate division of the Superior Court, I used to love it when I represented the appellant. It happened when the panel said to me, we don't have to hear from you, Mr. Greenberg. Let us hear from the appellate. And I used to say, thank you very much. I waved my orchid. And then I would sit down. So on that note, Your Honor, let me just reiterate our position that it is, it is INAN's position that the decisions of the district court should be affirmed in their entirety. And we're completely correct in the district court's interpretation of both Pennsylvania law on the issues of the statute of limitations and New York law on the issues of the wrongful claim. And on the New York law, clearly the status of being born is not a legally cognizable injury. Regardless of how you characterize the cause of action. That is correct. It's the injury that kills it, not the cause of action. Correct. Because no matter what theory of recovery is pled in the complaint, the plaintiff still carries the burden of coming forward with proof of damages, damages being one element, whether the claim is tortious based in negligence, tortious based in strict product liability, or contractual based in warranty or straight contract. Under any of those settings, the plaintiff still has to prove damages. And under the holding of Becker, and the cases have been legion in following Becker, that show that the essence of Becker and the reason the wrongful life claims are there is no legally cognizable harm or damage. So period. No matter what the cause of action may be characterized or denominated in a pleading. And that is, of course, particularly unique and true in this scenario, where you are dealing with a genetically acquired disease in the context of assistive reproductive technologies, in this case, an artificial insemination process. And I think your honors were quite correct in pointing out that what was the alternative here? Had Mrs. Donovan been aware of the information that the anonymous donor was carrying, and a carrier of Fragile X reason would dictate that she would have chosen or selected a different donor in which to conceive her child. And that is why, regardless of whether the claims are negligence based or on a but-for causation type of issue, they still lack damages because you cannot put this child in a position of before the alleged tort or breach took place because that would be putting the child into a state of non-existence. Now, in regard to the statute of limitations issue, the discovery rule and the fraudulent concealment exceptions, which told the statute, are both subject to the reasonable diligence standard to protect one's own legal interests. And common sense comes into play here. And when you look at the chronology and the timeline, what we have here is that this child was born in January of 1996, and the allegations of the complaint concede that within months, the mother noted some developmental delays. And one thing that I would point out that was not that the genetic testing was done by SmithKline was because in November and December of 1997, the mother's own pediatrician had referred the child for testing to the Philadelphia Children's Hospital where she was clinically diagnosed with Fragile X syndrome. And that is what was the precursor to the testing. So clearly at that point in late 1997, or at the very latest, May of 1998, when the results of the genetic testing were published to the parent indicating that the anonymous donor did carry the Fragile X on the X chromosome, then at that point in time, the mother certainly possessed the salient facts concerning the occurrence of the injury and who or what caused it, and then had the obligation to pursue and investigate claims. So that I'm clear, is this the argument you're not going to make, or is this a different argument? I'm just trying to point out. I am trying to take that opportunity. You just couldn't resist. Yes, but her injury, I think she just can't. I prepared this argument, and by gosh, I'm going to give it away. But is it fair to say that there is a difference between being a Fragile X carrier and having Fragile X syndrome, correct? That is correct. So it looks as if, from what we have in the record, that when the testing was first done by SmithKline and by Dr. Gilbert and McDonough gave their reports, that she was, Brittany was, a Fragile X carrier only. And by the time of the clinical, with no clinical manifestations of Fragile X, right? No. I would disagree with that last part because of the allegations in the complaint with that there were some clinical manifestations of developmental delays and shyness, as you mentioned. So at that point in time, there were some clinical manifestations which led to the clinical diagnosis in 97, which predated the 1998 testing. So that there were some clinical manifestations. Your point is well taken, Your Honor, in terms of the fact that the SmithKline testing did show that she was merely a carrier based on the number of repeats on the alleles in the chromosomal analysis. However, by that time, the record already establishes that there were clinical manifestations by the child's own pediatrician and mother, which led to a clinical diagnosis before that. I'm just reading from what I see. She has a normal appearance and normal development. And I mean, I don't want to beat this to death, but I don't see it. And even in the letter that came from the defendants on November 17, 1998, you say in a footnote that there are no clinical symptoms. There is, well, anyway, I'm not going to go into that. Is it fair to say by the time that report was done in 2008, she had progressed or regressed into Fragile X syndrome, or is that not a correct statement of medicine, of the medicine involved here? I cannot stand before this panel and answer that question. The record has not been developed, frankly, to answer that question. But now they're saying she has clinical characteristics of Fragile X syndrome. Right. We do not know what prompted Ms. Donovan to take her child, what seems to be the subject of a clinical study in California in roughly 2006. But what is left unexplained by this record is what transpires between 1998 and at a minimum 2006, which is eight years that go by without any type of diligence or investigation to pursue what may have, what was known at that point by Mrs. Donovan because of her retention of prior counsel to draft the complaint and at least raise this issue to IDAN. That's the critical period in my view, that there's eight years that go by. And then even at that point, she submits the child to this clinical study in August of 2006, and then another two years elapse by the time that paper is presented in the medical journal, at which time Ms. Donovan claims now that is what finally and ultimately convinced her that this has to be the cause. And I stand here saying that that view approaches the height of temerity to take that long to have all of this information in front of you and now say 10 or 12 years later, aha, now I have the information I need to pursue this claim. And on that note, Your Honors, I will rely on the arguments. Well, since you've been treated so gently so far, let me just ask one little last question, which I think you say at page 28 of your brief that the law does not provide a remedy for every wrong. You're not conceding or are you that there was a wrong committed here? I am not conceding that there were any wrongs. I point that out from the standpoint that there are unfortunately many instances and unfortunate, as is certainly the case here. And I don't stand before this panel today to say that I have no personal sympathy for what this child may be going through. I have not had a chance to meet her. And the mother. And I do not mean to display that type of callous attitude by no means. But the point being... Injury might have been a better word than wrong. Okay, then perhaps that was an error on my part. We can continue to make arguments and not rest on the reason. That's right. Things come out. He wanted to get out before I asked the question, so I apologize. Thank you, Your Honors. Thank you. Very briefly, Your Honors. Let me just ask you this, Mr. Fisher. You suggest in your briefs that the question be certified to... I was just about to say that, Your Honors. Because of the dearth of law, obviously. There is no case that has decided whether or not the concept of wrongful life applies to a products liability, breach of contract, third-party liability case in this type of context. Do you know whether or not the New York Court of Appeals has a certification procedure? Our rules require that we rely upon the certification procedure of the jurisdiction we're certifying to. There's no procedure in place, no rules for accepting the certification in the Court of Appeals. We really can't do it under our rules. I don't, Your Honor, but I can certainly find out and submit something. You are left, I believe, in a position of predicting what New York would do if they presented with this case. And I understand where Your Honors are coming from. You've made that clear. But I don't believe that New York has ever gone that far in these types of cases. And by their blood shield laws, they've made it clear that they are not considering sales of organs and tissues exempt from a potential products liability action. So I think it's, I would respectfully request the ability to submit something with respect to the certification process in New York. When the blood shield law was passed in New York State, I think that there was a major problem with the blood banks largely in New York City. And there was a special situation there because they had to get blood. And many of the people they were buying it from were people of doubtful background. And I think that's why the statute was passed that way. I don't think at that time these other conditions that you describe were such a big thing. I think if you look at it, you'll see the history of that. But they have amended that act in 85, 89, and even more recently in 2006, and never saw fit to include organs or tissue. Never broadened it. To exclude that. Unlike Pennsylvania, which specifically says not only that it's not a sale, but you can't sue them for products liability. You've got to prove negligence. So New York has obviously, in their legislature anyway, said that these people are potentially fair game for a products liability action. And this issue has not come before them. Thank you, Your Honor. Thank you, Mr. Thyssen. Just to pick up on something that earlier Mr. Lubin mentioned, I would hope that no one would assume that we are not personally moved and touched by the incredibly horrific and tragic circumstance here. But obviously, we can only do what the law allows us to do. There may or may not be consensus, even amongst ourselves, as to what that is. But no matter what the end result is, it should not reflect any lack of concern or sympathy for what the mother has gone through. We all have kids up here. So in anybody who's a parent, and you read a case like this, you can't help but put yourself in the there but for fortune situation. But again, we can only do what the law allows us to do. Thank you very much.